IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

```
- - - - - - - - - - - - - X
UNITED STATES OF AMERICA,  :
                           :
        Plaintiff,         :
                           :
vs.                        :      Criminal No. 1:12-cr-026
                           :
RICHARD PEARSON,           :        HEARING TRANSCRIPT
                           :
        Defendant.         :
- - - - - - - - - - - - - X
```

Courtroom, Fourth Floor
U.S. Courthouse
East First and Walnut Streets
Des Moines, Iowa
Thursday, April 26, 2012
4:00 p.m.


BEFORE:  THE HONORABLE CELESTE F. BREMER, Magistrate Judge.


APPEARANCES:

For the Plaintiff:        JASON GRIESE, ESQ.
                          Assistant U.S. Attorney
                          U.S. Courthouse Annex
                          110 East Court Avenue
                          Des Moines, Iowa  50309


For the Defendant:        TIMOTHY ROSS-BOON, ESQ.
                          Assistant Federal Public Defender
                          400 Locust Street, Suite 340
                          Des Moines, Iowa  50309


ANN T. MOYNA - CERTIFIED SHORTHAND REPORTER

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Government: | | | | |
| Dave Larson | 5 | 16 | 23 | 23 |

1          P R O C E E D I N G S

2          THE COURT:  This is case 1:12-26, and it's United

3    States versus Pearson.

4          Mr. Pearson, there was an indictment returned

5    yesterday.  You are charged in this case with travel with the

6    intent to engage in illicit sexual conduct and coercion and

7    enticement.

8          You have the right to remain silent.  Anything you say

9    can and will be used against you.  You have the right to have

10   counsel.  The Public Defender's Office has been appointed to

11   represent you.  When you appeared earlier you were on a criminal

12   complaint and we had set today for your detention hearing and,

13   if you needed one, a preliminary hearing.  Now that there's been

14   an indictment returned, the Grand Jury's made the probable cause

15   finding.

16         Our job today is to present the charge to you, set

17   some pretrial deadlines and trial date, and then conduct the

18   detention hearing if we still need that.  If you want to go

19   ahead and do the arraignment.

20         MR. GRIESE:  Thank you, Your Honor.

21         On April 25, 2012, the United States Grand Jury for

22   the Southern District of Iowa returned a four-count indictment

23   in which the defendant is charged in Counts 1 and 4 with travel

24   with intent to engage in illicit sexual conduct and in Counts 2

25   and 3 with coercion and enticement.  If the defendant is

1  convicted of either Count 1 or Count 4, or both, on those counts

2  of conviction, he faces not more than 30 years imprisonment, up

3  to a $250,000 fine, or both such fine and imprisonment.  Not

4  less than five years, up to life, of supervision upon his

5  release from prison, and a mandatory $100 special assessment.

6          If Mr. Pearson is convicted on either Count 2 or Count

7  3, or both, he faces a mandatory minimum 10 years in prison, up

8  to life in prison, not more than a $250,000 fine, or both such

9  fine and imprisonment.  At least five years up to life of

10  supervision upon his release from prison, and a mandatory $100

11  special assessment.

12          Mr. Ross-Boon, does your client have a copy of the

13  indictment?

14          MR. ROSS-BOON:  He does.  I will state to the

15  Government and the Court that I have had the opportunity to meet

16  with Mr. Pearson and review the indictment with him.  He is

17  charged in his true and correct name, correctly spelled.  I

18  believe he understands the general nature of the counts against

19  him, including the penalties provided by law.  He will waive the

20  formal reading of the indictment and plead not guilty to all

21  counts, Your Honor.

22          THE COURT:  All right.  The Court accepts and enters

23  the not guilty pleas, sets the case for trial in the two-week

24  period beginning, it looks like all I have is June 4th.  Is that

25  our trial week?

1          THE CLERK OF COURT:  Yes.

2          MR. GRIESE:  I believe it is, Your Honor.

3          THE COURT:  All right.  Thank you.

4          June 4th.  That means Government discovery should be

5   produced by May 10, reciprocal discovery and motions by May 21.

6   And notify the Clerk of Court by May 25th as to whether or not

7   you need the June 4th trial setting.

8          The Government had earlier moved for detention.  Is

9   that still your motion?

10         MR. GRIESE:  It is, Your Honor.

11         THE COURT:  Okay.  And is Defendant ready for a

12  detention hearing today?

13         MR. ROSS-BOON:  Yes, Your Honor.

14         THE COURT:  All right.  I have looked at the Pretrial

15  Service report and also the criminal complaint.  Does the

16  Government have anything to add in addition to that?

17         MR. GRIESE:  Your Honor, the Government calls Dave

18  Larson.

19         THE COURT:  All right.

20             DAVE LARSON, GOVERNMENT WITNESS, SWORN

21                     DIRECT EXAMINATION

22  MR. GRIESE:

23  Q.  Mr. Larson, are you employed?

24  A.  Yes, I am.

25  Q.  How so?

1  A.  I'm a special agent with the Federal Bureau of

2  Investigation.

3  Q.  How long have you been with the FBI?

4  A.  I have been with the FBI for over 10 years.

5  Q.  I want to direct your attention to March of this year, 2012.

6  Were you contacted or become involved in an investigation that

7  was ongoing with the Atlantic Police Department in Atlantic,

8  Iowa?

9  A.  I was.

10  Q.  Is Atlantic in the Southern District of Iowa?

11  A.  It is.

12  Q.  Did this investigation begin when a citizen turned in a

13  cellular telephone?

14  A.  It did.

15  Q.  What did law enforcement do when this telephone was turned

16  in?

17  A.  The individual who turned in the phone informed law

18  enforcement that they believed that child porn was on the phone.

19  Atlantic PD then looked through some of the images on the phone

20  and noticed that there was pornography on the phone.  Later

21  identified one of the people that were in these pornographic

22  pictures to be J.S., who is a 15-year-old minor that they were

23  familiar with.

24  Q.  This individual resides in the Atlantic, Iowa, area?

25  A.  Yes.

1  Q.  Did they later speak with J.S. and confirm that this was his

2  cellular telephone?

3  A.  They did.

4  Q.  Were you contacted at some point after that?

5  A.  I was.

6  Q.  Was a search warrant obtained for the contents of that cell

7  phone?

8  A.  Atlantic PD did obtain a search warrant for the contents of

9  the cell phone.

10 Q.  Was the search warrant--  Were the authorities able to

11 retrieve the materials that were on the cell phone?

12 A.  Yes.

13 Q.  And did that include a number of photographs?

14 A.  It did.

15 Q.  Have you reviewed those photographs?

16 A.  I have.

17 Q.  And did you detail in the criminal complaint what was on

18 those photographs?

19 A.  I detailed in the complaint some of the photographs.

20 Q.  I want to direct your attention to six of those photographs

21 in particular.  Let's start with the photograph you first

22 describe, or you described in paragraph 16A of the criminal

23 complaint.  Do you recall that photograph?

24 A.  I do.

25 Q.  Can you describe to the Court what's on there?

1   A.  Yes.  In the picture both the defendant, Mr. Pearson, and

2   J.S. appear to be embracing.  They are clothed.  And there is,

3   bordering the photo are flowers and the shape of a heart.  A

4   banner at the top of the photo says, "Together 4-ever."

5   Q.  The second photo that's detailed in subparagraph B, did you

6   observe and describe that photograph?

7   A.  I did.

8   Q.  Go ahead and describe it for the Court.

9   A.  That image is of Mr. Pearson standing naked in a doorway.

10  He is arching his back in the photo and he has his hands placed

11  in various areas.  You can see his genitalia.

12  Q.  Does the individual in the photograph appear to be posing

13  for the photo?

14  A.  He does.

15  Q.  Can you clearly observe the photograph as it was retrieved

16  from J.S.'s cellular telephone?

17  A.  I can.

18  Q.  Do you recognize the person who is in that photograph in the

19  courtroom here today?

20  A.  I do.

21  Q.  Can you point him out?

22  A.  It's Mr. Pearson.

23  Q.  Sitting to the left of defense counsel?

24  A.  Correct.

25  Q.  The third photograph described in 16C, can you describe that

1  for the Court?

2  A.  Yes.  This is an image of Mr. Pearson and J.S.  They are

3  both seated and leaning back.  Pearson is in the back or behind

4  J.S.  Pearson has his arm around J.S. and is holding up J.S.'s

5  right hand.  On both Mr. Pearson's right hand and on J.S.'s

6  right hand are matching rings on the ring fingers.

7  Q.  The photograph depicted in subparagraph D, can you describe

8  that to the Court?

9  A.  In this image both Mr. Pearson and J.S. appear to be naked.

10 The image only covers from the stomach up.  But they both appear

11 to be lying on a bed in an embrace.  Pearson is kissing the

12 forehead of J.S.

13 Q.  The photograph depicted in subparagraph E, can you describe

14 that for the Court?

15 A.  Yes.  The image here is of two penises that are lined up

16 against each other--against each other and facing a different

17 direction.

18 Q.  Can you identify who is who in that picture?

19 A.  You cannot see the faces, but based on where the picture was

20 found and other pictures on the cell phone, it is my opinion

21 that the penises belong to Mr. Pearson and J.S.

22 Q.  The photograph depicted in subparagraph F, can you describe

23 that, please?

24 A.  Yes.  In that particular image Mr. Pearson is performing

25 oral sex on male genitalia.

1  Q.  Now, this is different from what's indicated in the

2  complaint; is that correct?

3  A.  That is correct.

4  Q.  The information in the complaint is incorrect; correct?

5  A.  Yes.

6  Q.  It's actually Mr. Pearson who is performing oral sex on an

7  unknown individual?

8  A.  In my opinion, I know who that individual is, but that

9  individual's face cannot be seen.

10 Q.  And what do you base that on?

11 A.  I base that on the location of where the photo was found,

12 and the other photos that were found on the cell phone itself.

13 Q.  Now, after these pictures were retrieved and examined by

14 you, were you able to determine, based upon what's in the

15 background of the photographs, where they were taken at?

16 A.  Yes.

17 Q.  Where were they taken at?

18 A.  Some of the artifacts in the background are consistent with

19 items that are seen at the Turkey Creek Lodge in Atlantic, Iowa.

20 Q.  Have you been to the Turkey Creek Lodge?

21 A.  I have.

22 Q.  Did you speak with the Turkey Creek Lodge in an attempt to

23 determine who had been staying there?

24 A.  I did.

25 Q.  And had Mr. Pearson been staying--a guest at the Turkey

1  Creek Lodge?

2  A.  He has been.

3  Q.  On how many occasions?

4  A.  On multiple occasions.  I know of at least three instances,

5  but there may be more than that.

6  Q.  Did you examine the registration card indicating that he had

7  stayed there, arrived on February 10th, and left on

8  February 12th?

9  A.  I did.

10  Q.  Stayed in Room 27?

11  A.  Yes.

12  Q.  Did he list a residence city where he was coming from?

13  A.  He did.

14  Q.  What does that indicate?

15  A.  I do not have the address in front of me, so I don't recall

16  the street number, but the street was Banister Court in Colorado

17  Springs.

18  Q.  Colorado?

19  A.  Yes.

20  Q.  Were you able to obtain identifying information about

21  Mr. Pearson?

22  A.  I was.

23  Q.  His criminal--his driver's license information?

24  A.  Yes.

25  Q.  How old is Mr. Pearson?

1  A.  Approximately 50 years of age.

2  Q.  Also contained on the cell phone were a number of text

3  messages; is that correct?

4  A.  That is correct.

5  Q.  And those text messages are depicted in the complaint

6  starting at paragraph 14; is that correct?

7  A.  That is correct.

8  Q.  And would you generally describe those text messages as

9  being romantic in nature?

10  A.  I would.

11  Q.  Did they indicate what number J.S. was receiving these

12  messages from?

13  A.  It did.

14  Q.  Were you able to trace that number and determine who owned

15  that phone or who that phone was registered to?

16  A.  I did.

17  Q.  Who was that phone registered to who was sending these text

18  messages to J.S.?

19  A.  Mr. Pearson.

20  Q.  Again, these messages are referred to in paragraph 14, pages

21  5, 6, 7, and 8 of the criminal complaint affidavit; correct?

22  A.  Correct.

23  Q.  Are those accurately described in the criminal complaint

24  affidavit?

25  A.  To the best of my knowledge, yes.

1  Q.  Did you obtain an order to obtain what's commonly referred

2  to as ping information or cell site locator data for the

3  defendant's cell phone?

4  A.  I did.

5  Q.  Were you able to track his movements in April of 2012?

6  A.  Yes.

7  Q.  Specifically April 20th of 2012?

8  A.  Yes.

9  Q.  Did that information first pick him up, meaning Mr. Pearson,

10 in Denver--in the Colorado area?

11 A.  It did.

12 Q.  And then did it show that he had moved to some other area?

13 A.  It did.

14 Q.  Where?

15 A.  Omaha, Nebraska.

16 Q.  All right.  Within a few hours of that were you able to

17 identify where Mr. Pearson was at that time?

18 A.  Yes.

19 Q.  Where?

20 A.  The next ping came up in Walnut, Iowa, and then Atlantic,

21 Iowa.

22 Q.  Ultimately, within a few hours of that ping, was--on April

23 20th, 2012, was the defendant arrested at the Turkey Creek Lodge

24 in Atlantic, Iowa?

25 A.  He was.

1 Q. At that time did he have items in his possession indicative

2 of a sexual nature?

3 A. He did.

4 Q. What did he have in his possession?

5 A. He had two sex toys, one of which would at least be referred

6 to as a dildo.

7 Q. Were there a number of other items which are--which could be

8 classified as sexual in nature as well?

9 A. Yes.

10 Q. During the course of your investigation have you had an

11 opportunity to speak to Mr. Pearson's ex-wife?

12 A. I have.

13 Q. Did she provide you with information about Mr. Pearson's

14 criminal past?

15 A. She did.

16 Q. Did she indicate whether or not Mr. Pearson had discussed

17 with her an incident that occurred in the late eighties?

18 A. She did.

19 Q. What did she say?

20 A. She said that Mr. Pearson had told her that at one point

21 when he was a school bus driver he had pleaded no contest to

22 exposing himself to a minor.  That minor was a female who was

23 apparently the last remaining minor on the bus.

24 Q. Did you do anything in an attempt to corroborate that

25 information?

1  A.  I did.  I contacted Los Angeles probation to attempt to

2  corroborate that information.

3  Q.  Did the defendant's ex-wife indicate if he would have

4  possibly been convicted under a different name?

5  A.  She did.

6  Q.  What was that name?

7  A.  It could possibly have been under the name of Richard

8  Norris.

9  Q.  In contacting California were you able to find such a

10  conviction?

11  A.  I was.

12  Q.  What information did you find out?

13  A.  I found out that there was a conviction for indecent

14  exposure.

15  Q.  In what year?

16  A.  In 1986.

17  Q.  Does that criminal printout indicate a number of different

18  names?

19  A.  It does.

20  Q.  What names are those?

21  A.  Richard Paul Norris, Richard Howard Pearson, Richard Paul

22  Pearson, Richard Paul Norris Pearson.

23        MR. GRIESE:  Your Honor, that's all of the questions I

24  have.  I would note for the Court that I do have the photographs

25  discussed in open court today available for the Court's review

1    if it so desires.

2              THE COURT:  Has Mr. Ross-Boon seen them?

3              MR. GRIESE:  He has.

4              THE COURT:  All right.  I will go ahead and look at

5    them.

6              Thank you.

7              Cross-examination?

8              MR. ROSS-BOON:  Thank you, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. ROSS-BOON:

11   Q.  Agent Larson, you have indicated in the complaint in your

12   testimony today that a phone was brought to the Atlantic Police

13   Department by a citizen; is that correct?

14   A.  That's correct.

15   Q.  This person was nonlaw enforcement?

16   A.  Correct.

17   Q.  Was this person acquaintances of either J.S. or Mr. Pearson?

18   A.  I don't believe he's an acquaintance of Mr. Pearson.  It has

19   yet to be determined whether he is an acquaintance of J.S.

20   Q.  Did this citizen indicate why he thought it was in his

21   mailbox, this phone?

22   A.  He did not know why it was in his mailbox.  He said he just

23   found it there.

24   Q.  And this citizen's a young individual, a minor?

25   A.  I'm not sure at this time.  That's a possibility.

1  Q.  Had you ever met this citizen?

2  A.  No, I have not.

3  Q.  But you indicated that when the citizen brought this phone

4  to the Atlantic PD they looked in the phone too in addition?

5  A.  They did.

6  Q.  And at that time I take it there was no search warrant.

7  A.  That's my understanding, yes.

8  Q.  Did you testify that one of the Atlantic PD officers was

9  able to identify J.S.?

10  A.  Correct.

11  Q.  How did he know J.S.?

12  A.  They had numerous run-ins with J.S. through performing law

13  enforcement duties.

14  Q.  Drugs?

15  A.  Yes.

16  Q.  Theft?

17  A.  Yes.

18  Q.  Anything else?

19  A.  My understanding is that they actually possibly interviewed

20  him over vandalism that was going on in Atlantic.

21  Q.  And are you aware of J.S.'s birth date?

22  A.  Yes.

23  Q.  Is it ███████████████--███████████?

24  A.  It is ████████.

25  Q.  And in 2012 he was 16; is that correct?

1  A.  He is now 16, yes.

2  Q.  And in February he would have been a month-and-a-half from

3  his birthday, approximately?

4  A.  Approximately, yes.

5  Q.  And the complaint lists a starting time of on or about

6  October of 2011; is that correct?

7  A.  That's correct.

8  Q.  So he would have been 15 1/2 when this, at least from the

9  information you have, when things began?

10  A.  Yes.

11  Q.  And you have mentioned that J.S. confirmed that it was his

12  phone.  Did you check to see who was on the phone contract?

13  A.  I have not done that at this time.

14  Q.  And a search warrant was obtained for that phone; is that

15  correct?

16  A.  That's correct.

17  Q.  Did it also include a request specifically to track the

18  location of that phone, the search warrant?

19  A.  I don't have the search warrant in front of me so I can't

20  comment on that.

21  Q.  When you indicated and identified my client in court, that's

22  based on just your personal observations; is that correct?

23  A.  That's correct.

24  Q.  How many times have you met with Mr. Pearson?

25  A.  Just the day of the arrest.

1  Q.  Now, you have indicated in the photograph that's in

2  paragraph 16C--I'm sorry--16A of the complaint, there's no

3  nudity; is that right?

4  A.  Allow me some time to--  Correct.

5  Q.  16B is an individual that you have identified as my client

6  standing naked; is that right?

7  A.  That is correct.

8  Q.  But the picture of--in 16D of the complaint is from the

9  waist up between these two individuals?

10  A.  That is correct.

11  Q.  And in the picture in 16E of the two penises, there are no

12  faces in that picture; is that correct?

13  A.  That is correct.

14  Q.  Now, I need you to clarify for me, if you would, 16F of the

15  complaint describes a photograph.  What was the problem you

16  testified to in the complaint?

17  A.  In the complaint it says that in the picture J.S. is

18  performing oral sex on male genitalia.  In reality the

19  photograph image is of Pearson performing oral sex on male

20  genitalia.

21  Q.  When you say it's Pearson, this is based on your

22  observations of Mr. Pearson.  You hadn't met him yet, right,

23  when you made the complaint, or had you?

24  A.  No, I had not met him when I made the complaint.

25  Q.  What were you making your comparison on as to who was in the

1  pictures?

2  A.  On the images that I had seen of Mr. Pearson.

3  Q.  And that was where, where did you get those images?

4  A.  I had gotten those images off of J.S.'s cell phone and a

5  driver's license photo.

6  Q.  And you had a search warrant for, I think you've already

7  indicated a search warrant for Mr. Pearson's phone at some

8  point, or did you?

9  A.  I don't have a search warrant for Mr. Pearson's phone.

10  Q.  So when you were tracking--when law enforcement was tracking

11  the pings, as described by the Assistant United States Attorney,

12  there was no warrant to track that phone's location?

13  A.  Right.  I'm sorry.  I confused search warrant with a ping

14  order.  I did have a ping order location search warrant on

15  Mr. Pearson's phone.

16  Q.  Okay.  So the ping order search warrant was signed by a

17  magistrate or judge?

18  A.  Signed by a magistrate.

19  Q.  And state or federal court?

20  A.  Federal.

21  Q.  The text messages that you described were--you testified

22  were romantic in nature; is that right?

23  A.  That is correct.  Right.

24  Q.  Have you, through your investigation, either through the

25  texts that are listed in the complaint or any other

1  investigation you've done, seen any text messages or

2  communication on these phones regarding the age of J.S.?

3  A.  None come to mind at the moment.

4  Q.  And there were no threats in any of the communication that

5  you've seen?

6  A.  Not that I'm aware of.

7  Q.  And just for clarification, the old charge that you looked

8  up in L.A. was 1986; is that right?

9  A.  That is right.

10 Q.  Did you do any other corroboration of Mr. Pearson in the

11 Colorado Springs area?

12 A.  No.

13 Q.  Did you interview anyone else in the Colorado Springs area

14 other than his ex-wife?

15 A.  Other than his ex-wife, no.

16 Q.  Have you or any other law enforcement interviewed J.S. about

17 this?

18 A.  No.

19 Q.  And has Mr. Pearson been interviewed about any of this?

20 A.  Mr. Pearson refused to be interviewed.

21 Q.  Was J.S. offered an opportunity to talk about this?

22 A.  We met with him and told him what was occurring, but we did

23 not formally request an interview from him.

24 Q.  So he was not involved in law enforcement's investigation

25 per se?

1  A.  Define involvement.

2  Q.  Well, you said he identified the phone; is that right?

3  A.  Yes.

4  Q.  Did he do anything else to assist law enforcement?  Did he

5  identify anything?  Did he talk about anything having to do with

6  Mr. Pearson?

7  A.  He talked about how he was introduced to Mr. Pearson.

8  Q.  And what did he say?

9  A.  He said that he became acquainted with Mr. Pearson through

10 Mr. Pearson's roommate.

11 Q.  Anything else?

12 A.  That's it.

13 Q.  I take it October 24th of '11, is listed in the complaint

14 and on the indictment because there is no information to believe

15 that anything began before that time?

16 A.  At the time that the complaint was done the only information

17 I had only went as far back as October 2011.

18 Q.  Is there an ongoing investigation of electronic media?

19 A.  Yes.

20 Q.  Is it your understanding that there could be additional

21 charges, or not?

22 A.  Yes.

23      MR. ROSS-BOON:  That's all of the questions I have,

24 Your Honor.  Thank you.

25      THE COURT:  Any redirect?

1                        REDIRECT EXAMINATION

2      BY MR. GRIESE:

3      Q.   In subparagraph D of the criminal complaint you indicated

4      that the creation date of the photograph in which Mr. Pearson

5      and J.S. appear to be naked lying down in an embrace was October

6      of 2011.

7      A.   Yes.

8      Q.   Is that where that October 2011 date comes from?

9      A.   That's where that date comes from, and it also comes from

10     the oldest text that had been recovered off of the phone at this

11     time.

12               MR. GRIESE:   That's all I have, Your Honor.

13               THE COURT:   Okay.  Anything else?

14                       RECROSS-EXAMINATION

15     BY MR. ROSS-BOON:

16     Q.   Just to follow up on that.  The creation date, the complaint

17     in paragraph 16D says the creation date of the file was

18     October 2nd of 2011.  Do you know how that information was

19     obtained?  Was it with a forensic expert?

20     A.   Yes, it was from the DCI examiner who obtained the

21     information off of the phone.

22     Q.   And so the phone basically date and time stamped that date

23     for that picture or when that picture was created?

24     A.   I'd have to check to see whether that particular picture was

25     taken with that phone.  Whatever instrument was used to take

1 care of that--created that picture is my assumption that it

2 created the file creation date.

3 Q.  Did J.S. tell you when the first time was he ever met the

4 person you've identified as Mr. Pearson?

5 A.  No, he did not.

6 Q.  Are you aware of any information indicating either J.S.

7 going to Colorado Springs or Mr. Pearson coming to this--to Iowa

8 in October of 2011?

9 A.  I don't know that there's information as of yet that says it

10 was specifically in October of 2011.

11          MR. ROSS-BOON:  I have nothing further, Your Honor.

12          THE COURT:  All right.  Anything else?

13          MR. GRIESE:  No, Your Honor.

14          THE COURT:  Okay.  We'll go ahead and excuse the

15 witness.

16                                    (Witness excused.)

17          THE COURT:  Any other testimony, proffer, or anything

18 for the Government?

19          MR. GRIESE:  No, Your Honor.

20          THE COURT:  All right.  And for Defendant?

21          MR. ROSS-BOON:  Yes.  Thank you, Your Honor.

22          By way of proffer, I have had the opportunity to speak

23 to Greg Liu, L-I-U, who is the service center manager at Knight

24 Transportation in Colorado Springs, Colorado, which is the

25 company that is listed in the Pretrial Service report where my

1   client was working.  Mr. Liu indicated to me that Mr. Pearson

2   has been working there for two months.  He was at the time an

3   over-the-road trucker.  They've had no negative issues.  In

4   fact, he says he's a very good worker.  He's always on time and

5   reliable.

6          I informed him of the nature of the charge, and he

7   indicated that they would, if he was allowed to, continue to do

8   over-the-road, but they would have, they thought, some local

9   jobs that would be day jobs, where he could return to Colorado

10  Springs at a decent hour on any given day.  They would be

11  willing to allow him to keep working if the judge were to allow

12  him to be released.

13         Your Honor, also by way of proffer, I would just state

14  on behalf of Mr. Pearson that he does have this town home in

15  Colorado Springs that he is in the process of buying.  He has

16  been in the Colorado Springs area since 1997.  Prior to working

17  at Knight Transportation he worked for 10 years at Rocky

18  Mountain Premix, as a driver for Rocky Mountain Premix.  Prior

19  to that--or somewhere in his, around the same time, he also

20  worked at Pioneer Sand, as a driver for Pioneer Sand, in the

21  Colorado Springs area.

22         His town home is still available to him.  He does have

23  a roommate.  Other than that--he would confirm that his ex-wife

24  and son live in the Colorado Springs area.

25         Other than argument, Your Honor, that's all of the

1  proffers we have.

2        Let me just say a little bit more.  Most of his family

3  is in California.  He does have brothers and sisters.  His

4  parents are deceased.  He is involved in social events in

5  Colorado Springs and has individuals that he bowls with, other

6  individuals in the community there in Colorado Springs, Your

7  Honor.  Thank you.

8        THE COURT:  All right.  Argument for the Government.

9        MR. GRIESE:  Your Honor, the Government is in

10  agreement with probation that there are no conditions or

11  combination of conditions which can reasonably assure either

12  Defendant's appearance in court or the safety of the community.

13        The defendant has absolutely no ties to the Southern

14  District of Iowa.  He now stands indicted.  The evidence

15  indicates that he was traveling on more than one occasion from

16  Colorado to the State of Iowa for the purpose of having sexual

17  contact with a 15-year-old boy.  Sexual conduct that is

18  evidenced from reviewing the photographs.

19        As such, he is and remains a danger to the community.

20  He does have at least one prior incident, at least as described

21  by him to his wife, which involved a minor child back in 1986.

22  The fact of the matter is, that these are serious charges, and

23  under the circumstances there's no combination of conditions

24  which could assure to this Court that he could safely be

25  released pending trial in this matter.  I would ask that he be

1 detained.

2         THE COURT:  All right.

3         Any argument for the defendant?

4         MR. ROSS-BOON:  Thank you, Your Honor.

5         Your Honor, the Government has the burden by a clear

6 and convincing evidence on the issue of danger to the community

7 and by preponderance on flight.

8         The defendant has the burden of production certainly,

9 but it is a limited burden of production, I would argue to the

10 Court.  And we would argue to the Court that, you know, the

11 evidence that's been presented, that the Government has failed

12 to prove by clear and convincing evidence that my client would

13 pose a danger to the community.  We would also argue that they

14 have failed to prove by a preponderance of the evidence that he

15 would be a flight risk.

16         Your Honor, the--  Let me begin by the nature and

17 circumstances of the crime, which Title 18, Section 3142(G) asks

18 the Court to consider.  This is, by the Government's allegation,

19 a 15 1/2 year-old boy in October of 2011, who turned 16 on

20 ████████.  I bring that to the Court's attention.  This is not

21 a child under 12, this is an older teenager.  I would also

22 suggest to the Court that in Iowa at the age of 16 one is

23 allowed to have consensual sex.

24         I'm bringing it up just so the Court is aware that

25 we're talking about an almost 16-year-old boy.  A 16-year-old

1  boy on April 20th, which is the only other time that the

2  Government has alleged that there was travel.

3        The nature of the text messages, I would submit to the

4  Court, are not threatening in nature.  The pictures that have

5  been referred to are, I think, in evidence before the Court,

6  perhaps insufficient to show by a clear and convincing evidence

7  of any danger at this point my client might pose to the

8  community that couldn't be resolved through conditions of

9  release.  Of course, that is the standard, Your Honor, whether

10  there are reasonable assurances on the issue of danger to the

11  community and whether he's a flight risk.

12       The defendant, by way of his limited burden of

13  production, which we feel we have satisfied, indicates that he

14  has lived in Colorado Springs for a good number of years, since

15  1997.  He was gainfully employed with Knight Transportation.

16  They have indicated to me that, as presented as a proffer, that

17  they were entirely pleased with Mr. Pearson.  They know the

18  nature of the charge against him.  They are willing to have him

19  continue to work there.  My client has a town home in Colorado

20  Springs that he's owned for at least a year-and-a-half.

21       He has an ex-wife and son in the area.  He has, as I

22  said, family in California, but numerous friends in the Colorado

23  Springs area.  He has established, I think, Your Honor, through

24  his burden of production, that there are community ties in the

25  Colorado Springs area.

1          There has been discussion of an old charge in 1986,

2    and I would suggest to the Court that there's been insufficient

3    evidence on that to determine that, as he sits here now, not

4    having had any criminal attention since 1986, that he would pose

5    the kind of danger that couldn't be remedied through tight Adam

6    Walsh-type conditions, and that's what we're asking the Court to

7    consider.

8          Because my client has no significant prior history in

9    the last 25 years, because he is gainfully employed, because of

10   the nature and circumstance of this crime, including the age of

11   the boy being 15 1/2 and 16, because of the nature of the

12   offense as presented by the Government, we don't feel--I feel

13   there are conditions, including, as I indicated, the Adam Walsh

14   conditions, including GPS, home detention, curfew.  He could

15   have courtesy supervision out of the Colorado Springs office.

16   They could supervise him.  Of course, he would not have a

17   computer and all of the other things that go with the Adam Walsh

18   conditions.

19          We would also suggest to the Court that he is

20   gainfully employed.  He will be able to work.  He will be able

21   to pay his bills.  He has the ability to come to court whenever

22   court would be required.  He would maybe, perhaps at some point,

23   be able to continue visitation with his son with supervision,

24   but we could obviously not do that as well.

25          We feel, Your Honor, that we have met our limited

1  burden of production.  The Government has failed in its burden

2  of persuasion to show the Court that there are no conditions

3  that would reasonably assure his presence and safety of the

4  community.

5       We would ask the Court to consider, if allowing him to

6  return to his town home at this point is insufficient, there are

7  other options to the Court.  As the Court is aware, there's a

8  halfway house in Colorado Springs.  That's a relatively large

9  community, and I believe there's a federal halfway house in

10  Colorado Springs, and there would be one here in Des Moines.

11  Mr. Pearson has a CDL.  If he's allowed to do day trucking work

12  when he is at the halfway house, he could continue to do that in

13  the more structured setting of the halfway house.

14       We would ask the Court to consider all of these

15  factors and allow Mr. Pearson to be released on the strict Adam

16  Walsh conditions.  As I said, my client is prepared to abide by

17  any terms and conditions, including the halfway house, that the

18  judge might put upon him, Your Honor.  Thank you.

19       THE COURT:  Okay.  Based upon the information that

20  I've reviewed, including the Pretrial Services report, the

21  proffers, the testimony, and information contained here, I'm

22  going to go ahead and order the defendant be detained.  I do

23  find risk of flight and I do find danger to the community.  The

24  risk of flight is based on, although he's got nine years in the

25  Colorado community, he's got some limited family ties there with

1  his 14-year-old son, who he does share custody with, but no real

2  other adult supervision or contact.

3       The nature and circumstances of the offense and the

4  weight of the evidence show ways that we need to work on

5  mobility and ability to contact people.  As an over-the-road

6  truck driver that's just not realistic.  The lack of criminal

7  history and age are positive factors, but I think considering

8  the potential penalties and the circumstances of the offense,

9  having him in a halfway house in Council Bluffs or Des Moines is

10 not appropriate.

11       I guess I would be willing to learn more about a

12 halfway house in Colorado, but I don't really know what the

13 facilities are or what kind of restrictions the person would

14 have, or what kind of employment he would have.  The-- Usually

15 I use employment to have a place for someone to be that I can

16 realize that they are going to be there and I'll find them.

17 Being any kind of truck driver, delivery driver, is not just

18 enough conditions or structure for that kind of circumstance.

19       I'm going to enter an order of detention.  You

20 certainly have the right to appeal that.  You would have to

21 order a copy of the transcript, which we would provide you.  If

22 you want probation to continue to look at what the options are

23 in Colorado Springs for a halfway house, they can certainly do a

24 supplemental report for you.  Without knowing a lot more about

25 whether they have any kind of programming and what kind of

1  employment he would need to have to be eligible, that's just not

2  an option I can use now.

3          All right.  Anything else we need to do?

4          MR. GRIESE:  Your Honor, I move for the release of the

5  exhibit.

6          THE COURT:  All right.  Is that okay with Defendant?

7          MR. ROSS-BOON:  Yeah.  No objection.

8          THE COURT:  We'll go ahead and release those back to

9  the Government.

10          Anything else?

11          MR. ROSS-BOON:  No, Your Honor.

12          MR. GRIESE:  No, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          (Hearing concluded at 4:45 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2           I, the undersigned, a Certified Shorthand Reporter of

3    the State of Iowa, do hereby certify that I acted as the

4    official court reporter at the hearing in the above-entitled

5    matter at the time and place indicated.

6           That I took in shorthand all of the proceedings had at

7    the said time and place and that said shorthand notes were

8    reduced to typewriting under my direction and supervision, and

9    that the foregoing typewritten pages are a full and complete

10   transcript of the shorthand notes so taken.

11          Dated at Des Moines, Iowa, this 3rd day of May, 2012.

12

13

14              /s/ Ann T. Moyna
                CERTIFIED SHORTHAND REPORTER
15

16

17

18

19

20

21

22

23

24

25